```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
                                          :
IN RE: CREDIT DEFAULT SWAPS ANTITRUST     :
LITIGATION                                :     13MD2476 (DLC)
                                          :
                                          :     OPINION AND
                                          :        ORDER
                                          :
                                          :
----------------------------------------- X
```

APPEARANCES:

For plaintiffs:

Raul Torrez
New Mexico Attorney General

Julie Meade
Division Director, Consumer and Environmental Protection Division
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87501

Victor A. Hall
P.O. Drawer 1508
Santa Fe, NM 87504-1508

David E. Kovel
Karen M. Lerner
Andrew M. McNeela
Thomas L. Popejoy
Kirby McInerney LLP
250 Park Avenue
Suite 820
New York, NY 10177

Anthony E. Maneiro
211 West Wacker Drive, Suite 550
Chicago, IL 60607

Richard J. Leveridge
Chris Leonardo
Jason S. Rubinstein
Ethan H. Kaminsky

Gilbert LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, D.C. 20003

Michael Dell'Angelo
Michael J. Kane
Candice J. Enders
Berger Montague
1818 Market Street
Suite 3600
Philadelphia, PA 19103

For defendants Bank of America Corporation and Bank of America, N.A.:
Paul S. Mishkin
Sheila R. Adams
Cristopher Lynch
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

For defendant Barclays Bank plc:
Jeffrey T. Scott
Matthew J. Porpora
Jonathan S. Carter
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498

For defendant BNP Paribas:
Joshua A. Goldberg
Amy N. Vegari
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

For defendants Citibank, N.A. and Citigroup Global Markets Inc.:
Karen Hoffman Lent
Jay B. Kasner
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001

For defendant Credit Suisse AG:
Herbert S. Washer

David G. Januszewski
Jason M. Hall
Margaret A. Barone
Cahill Gordon & Reindel LLP
32 Old Slip
New York, NY 10005

For defendant Deutsche Bank AG:
John Terzaken
Simpson Thatcher & Bartlett LLP
900 G Street, NW
Washington, DC 20001

For defendant Goldman Sachs & Co.:
Robert Y. Sperling
Staci Yablon
Paul, Weiss, Wharton, Rifkind & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

For defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.:
Shadman Zaman
Covington & Burling LLP
One CityCenter
850 Tenth St, NW
Washington, DC 20001

For defendant Morgan Stanley & Co. LLC:
Michael A. Paskin
Damaris Hernández
Lauren M. Rosenberg
Cravath, Swaine & Moore LLP
Worldwide Plaza, 825 Eighth Avenue
New York, New York 10019

For defendant NatWest Group Plc:
James R. Warnot, Jr.
Patrick C. Ashby
Nicole E. Jerry
Linklaters LLP
1290 Avenue of the Americas
New York, New York 10104

Adam S. Lurie
Linklaters LLP

3

601 13th St. NW
Suite 400
Washington, DC 20005

DENISE COTE, District Judge:

Certain banks who were defendants in this class action ("Banks") have moved to enforce its 2015 class settlement against three class members ("New York Action"). Those three class members -- New Mexico State Investment Council ("SIC"), Public Employees Retirement Association of New Mexico ("PERA"), and the New Mexico Educational Retirement Board ("ERB", and, collectively, the "New Mexico plaintiffs") -- filed an action on June 30, 2021 in the District of New Mexico ("New Mexico Action"). For the following reasons, the motion is granted. The New Mexico plaintiffs are barred from pursuing their claims against the Banks in the New Mexico Action for any alleged violation of the antitrust laws based on conduct occurring before June 30, 2014.

## BACKGROUND

The Banks seek to enforce the release that binds class members in the New York Action. Before describing that litigation, which was filed in 2013 and settled in 2015, it will be helpful to describe the market for credit default swaps ("CDS") in which the Banks participate. After a description of

4

the claims brought in the New York Action and the terms of its settlement, the claims raised in the New Mexico Action will be described.

I.   CDS Markets

A CDS is a derivative whose value depends on the value of an underlying debt instrument.  The buyer of the CDS purchases the seller's promise to pay on the occasion of a "credit event," such as a default on the debt instrument by a third party known as the "reference entity."  Market makers, also referred to as "dealers," sell CDS to buyers, buy CDS from sellers, and hold CDS until a match emerges.  A dealer offers a "bid" price at which the dealer will purchase and an "ask" price at which the dealer will sell.  By keeping their bid lower than their ask, dealers can capture the difference, known as the "bid/ask spread."  In re Credit Default Swaps Antitrust Litig., No. 13md2476 (DLC), 2016 WL 2731524, at *1 (S.D.N.Y. Apr. 26, 2016)("New York Opinion").

When a credit event occurs, the CDS contract is settled through a CDS auction process, where a final auction price is determined.  Once the final auction price is determined, the seller "becomes obligated to make a credit protection payment that applies . . . the CDS auction final price" to the CDS or the portion of an index CDS that the reference entity represents.  In re Credit Default Swaps Auctions Litig., Civ.

5

No. 21-0606 KG/DLM, 2023 WL 3821337, at *4 (D.N.M. June 5, 2023) ("New Mexico Opinion").

II. The New York Action and Settlement

The allegations and procedural history in the New York Action are described in the New York Opinion, which described the basis for the approval of the settlement. In brief, in October of 2013, a class action was filed in the Southern District of New York against certain banks, the International Swaps and Derivatives Association ("ISDA"), and both Market Group Holdings Ltd. and Market Group Ltd. (together, "Markit"). The lawsuit alleged that the defendants engaged in anticompetitive acts that affected the prices of CDS in violation of § 1 of the Sherman Act, among other claims. The plaintiffs alleged that, beginning in 2008, the defendants conspired to prevent exchange trading of CDS. They asserted that the banks, who were referred to as the Dealer Defendants, agreed with each other not to deal with any central clearing platform that might allow CDS trading and instead to clear almost all transactions through the one clearinghouse they could control, i.e., ICE Clear Credit LLC ("ICS"). The plaintiffs further alleged that the Dealer Defendants conspired to limit changes to the over-the-counter CDS market and imposed rules restricting participation in ICS that were designed to prevent a transition to exchange trading. The plaintiffs alleged as well

6

that the Dealer Defendants pressured Markit and ISDA not to grant any licenses that allowed CDS to trade via a central limit order book or on an exchange platform, thus ensuring that some Dealer Defendant would be on at least one side of every CDS transaction. This activity harmed the class by keeping the CDS market opaque, preventing competition, and maintaining inflated bid/ask spreads on CDS transactions.

To settle the lawsuit, the defendants paid over $1.864 billion. ISDA also agreed to injunctive relief deigned to bring greater transparency and competition to the CDS market, including creating a new independent Licensing Subcommittee. 2016 WL 2731524, at *3.

A Notice of Settlement was mailed to identified class members on January 11, 2016 (the "Class Notice"). "Class members" were defined to include "[a]ll persons or entities . . . who, during the period of January 1, 2008 through September 25, 2015, purchased CDS from or sold CDS to the Dealer Defendants, their respective affiliates, or any purported co-conspirator, in any Covered Transaction." A "Covered Transaction" was defined to include any purchase or sale of CDS by or on behalf of a person domiciled or located in the United States or its territories at the time of sale, or where the

7

purchase or sale was in United States commerce or otherwise fell within the scope of U.S. antitrust laws.

In the Class Notice, class members were advised that they would be releasing, if they did not opt out, all claims "related in any way" to the Released Claims. Released Claims were further defined in the Settlement Agreement, to which all class members were given access:

> "Released Claims" means any and all manner of claims, causes of action, cross-claims, counterclaims, suits, demands, actions, rights, charges, liabilities, losses, obligations, and controversies of any kind, nature, or description whatsoever . . . occurring prior to June 30, 2014, that are alleged or that could have been alleged in the Action relating in any way to any CDS Transactions or Potential CDS Transactions . . .

(Emphasis supplied.)

The Release further states:

> Released Claims include but are not limited to any claims arising from or relating in any way to: (i) any conduct by any of the Released Parties that has been or could be alleged to be or have been anticompetitive relating to, arising out of, or affecting or potentially affecting any CDS Transaction or Potential CDS Transaction; (ii) any joint conduct by any of the Released Parties that has been or could be alleged to have unfairly increased the price or widened or otherwise manipulated the spread of any CDS Transaction or Potential CDS Transaction . . . . (iii) any joint conduct relating to potential or actual clearinghouses, exchanges, trading platforms and/or other

8

> entities directly or indirectly involved or potentially involved with any CDS Transaction or Potential CDS Transaction . . . and including but not limited to any conduct that has been or could be alleged to have delayed or prevented or manipulated exchange trading or any other method or form of clearing, executing or trading of CDS Transactions through any means . . . (iv) <u>any joint conduct</u> relating to potential or actual involvement, participation, <u>or ownership in any</u> organization, entity, <u>working group</u> or other group <u>related in any way to CDS or CDS Transactions</u> . . . ."

(Emphasis supplied.)

The New Mexico plaintiffs were class members and did not opt out of the settlement or raise any objections to the terms of the settlement or the release. The settlement was approved following a Fairness Hearing on April 15, 2016.

III. The New Mexico Action

The New Mexico Action was filed on June 30, 2021. On June 5, 2023, the Honorable Kenneth Gonzales denied in part the motion to dismiss the New Mexico Action. In doing so, he describes the claims in the lawsuit as follows: Beginning in 2005, the defendants "worked together to manipulate [the CDS auction] market for their own financial benefit and to the detriment of Plaintiffs" in violation of the Sherman Act, the Clayton Act, the Commodity Exchange Act, and New Mexico law. New Mexico Opinion, at *1. In 2005, the defendants designed the CDS auction process as a mechanism to settle CDS contracts in

the event of a credit event. Id. at *4-5. "Plaintiffs contend that Defendants have been secretly colluding, since the auctions' inception, to skew the CDS auction in the direction that serves their financial interests." Id. at *11.

In 2008, defendants formed a dealer-only "working group" that "functioned to maintain dealer control of the CDS auction market" by reaching agreements restricting who could participate in the CDS auction market and solidifying dealer control over decision-making in the auction process. Id. at *5. Defendants also "routinely share market information" to "access one another's pricing on CDS and bonds to clients" and exchange "material, non-public information about the auctions and the bonds that were the subject of the auctions." Id. at *9-11. Using these advantages, the defendants "have been consistently engaged in a multiyear bid-rigging and price-fixing scheme across all the CDS auctions to artificially skew the final auction price." Id. at *13. Plaintiffs sold or purchased protection on CDS indices in transactions with the Banks as early as 2008, and alleged they were harmed as a result of this price-fixing conspiracy. Id. at *16-17.

On June 5, 2023, Judge Gonzalez dismissed the claims against certain foreign defendants for lack of personal jurisdiction but allowed all claims against the Banks to

10

proceed. Id. at 35. On August 3, the Banks informed the New Mexico plaintiffs that they intended to enforce the New York Settlement. In accordance with § 15(n) of the Settlement Agreement, the parties submitted their dispute to mediator Daniel H. Weinstein on August 31. The parties failed to reach a resolution after two months of good-faith mediation. On November 3, 2023, the Banks filed their motion in this district to enforce the CDS settlement.

## DISCUSSION

The scope of a claims release is limited by the "identical factual predicate" and "adequacy of representation" doctrines. In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig., 827 F.3d 223, 236-7 (2d Cir. 2016) (citation omitted). "[C]lass action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the identical factual predicate as the settled conduct." Melito v. Experian Mktg. Sols., Inc., 923 F.3d 85, 95 (2d Cir. 2019) (citation omitted). Therefore, class members' claims may be barred "[w]here there is a realistic identity of issues between the settled class action and the subsequent suit, and where the relationship between the suits is at the time of the class action foreseeably obvious to notified class members." In re Am. Express Fin. Advisors Sec.

11

Litig., 672 F.3d 113, 135 (2d Cir. 2011) (citation omitted). "[A]dequate representation of a particular claim is determined by the alignment of interests of class members, not proof of vigorous pursuit of that claim." In re Payment Card Interchange Fee, 827 F.3d at 237 (citation omitted).

The New Mexico plaintiffs' claims share an identical factual predicate with the Released Claims. Both sets of claims are predicated on the Banks conspiring to manipulate the CDS market. Core to both sets of claims are allegations that the Banks intentionally organized the CDS market to reduce transparency and restrict non-dealers from participation, thus solidifying their control over the CDS market. In re Credit Default Swaps Antitrust Litig., No. 13md2476, 2014 WL 2731524, at *2-3; 2023 WL 3821337, at *4-5, 10. Both sets of claims allege that the Banks exchanged information among themselves to gain trading advantages in the CDS marketplace. 2014 WL 2731524, at *2-3; 2023 WL 3821337, at *9-10. Both sets of claims allege that, through their control over the CDS market and their influence over or ownership of related entities such as ISDA and Markit or working groups, the Banks colluded to manipulate prices in the CDS market. 2014 WL 2731524, at *1, 5; 2023 WL 3821337, at *2, *13.

12

The New Mexico plaintiffs' claims were also adequately represented in the New York Action. The interests of the New York Action settlement class, which included the New Mexico plaintiffs, were aligned insofar as the interest was recovery from losses from CDS Transactions with the Banks. The New Mexico plaintiffs are firms and funds that participate in the CDS market as investors, as were plaintiffs in the New York Action. Both claim that they were harmed by the Banks' manipulation of prices in the CDS market, which allowed the Banks to extract supracompetitive prices at the expense of investors. To release claims based on these very harms, defendants paid over $1.8 billion toward the New York Action settlement fund.

Plaintiffs contend that their claims do not share an identical factual predicate with the Released Claims because, while the New York Action's core allegations concerned a group boycott of the development of exchange trading of CDS, the New Mexico Action alleges a price fixing scheme through defendants' coordination of their auction submissions. Although these claims involve different facets of the CDS market, they stem from the same factual predicate of the Banks' conspiracy to create and maintain an inefficient CDS marketplace that allows them to manipulate prices for their own benefit.

13

Plaintiffs also contend that they were not adequately represented because they "received nothing" for the release of their CDS Auctions claims and they "were not given proper notice that they were releasing their CDS Auctions claims." But the settlement class plaintiffs agreed to release all CDS Transaction claims, "known and unknown," in exchange for compensation of $1,864,650,000. Indeed, in the Release, class members were deemed to have acknowledged "that the inclusion of 'Unknown Claims' in the definition of Released Claims was separately bargained for and was a key element of the Agreement." And while plaintiffs argue that they were not sufficiently notified that they were releasing claims related to the CDS auctions, the Class Notice defined a CDS Transaction as "any purchase, sale, trade, assignment, novation, unwind, termination, or other exercise of rights or options with respect to any CDS." Thus, these arguments fail.

The New Mexico plaintiffs argue that the Banks have waited too long to enforce the Release and are therefore barred by the doctrines of laches, estoppel, and waiver from succeeding on this motion. The existence of a release of claims is an affirmative defense that must be affirmatively stated in response to a pleading. Fed R. Civ. P. 8(c)(1). Affirmative defenses are subject to waiver if not raised. See Maye v. City

14

of New Haven, 89 F.4th 403, 407 (2d Cir. 2023). Defendants pleaded the Release as an affirmative defense in their respective answers to the New Mexico operative complaint. The Banks therefore did not waive the Release as an affirmative defense.

The defense of laches is available when a party has engaged in "unreasonable, prejudicial delay" in asserting a right. Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 667 (2014). To assert a defense of laches, a party must "establish both [the initiating party's] unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay." Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004) (citation omitted.) The Banks did not unreasonably delay in asserting a right to enforce the settlement. They were entitled to litigate the motion to dismiss, which, if successful, might have dismissed all of plaintiffs' claims, before bringing this action, which may only dismiss claims predicated on conduct occurring before June 30, 2014.

A defense of equitable estoppel is available when "the enforcement of rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." ABKCO Music, Inc. v. Sagan, 50

15

F.4th 309, 321 (2d Cir. 2022) (citation omitted). The Banks properly raised the Release in their respective affirmative defenses, which put plaintiffs on notice of the Release. Plaintiffs have not shown that they relied on any words or conduct by the Banks that indicated that the Banks would not seek to enforce the Release. Therefore, equitable estoppel does not bar enforcement of the settlement.

## CONCLUSION

The Banks' November 3, 2023 motion to enforce the Judgment is granted. The claims by the New Mexico plaintiffs against the Banks arising from their conduct occurring prior to June 30, 2014 are enjoined as set forth in the accompanying order.

Dated: New York, New York
January 26, 2024

DENISE COTE
United States District Judge