# 24-635

## In the United States Court of Appeals for the Second Circuit

BNP PARIBAS, BANK OF AMERICA CORPORATION, BARCLAYS BANK PLC, CITIBANK, N.A., DEUTSCHE BANK AG, THE ROYAL BANK OF SCOTLAND GROUP PLC, GOLDMAN SACHS & CO. LLC, CITIGROUP GLOBAL MARKETS INC., MORGAN STANLEY & CO. LLC, JPMORGAN CHASE & CO., CREDIT SUISSE AG, BANK OF AMERICA N.A., JPMORGAN CHASE BANK, N.A.,

*Defendants-Appellees,*

v.

NEW MEXICO STATE INVESTMENT COUNCIL, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, NEW MEXICO EDUCATIONAL RETIREMENT BOARD,

*Interested Parties-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York,
Case No. 1:13-md-2476 (The Hon. Denise L. Cote)

## BRIEF OF INTERESTED PARTIES-APPELLANTS

ERIC CITRON
STEFANIE OSTROWSKI
THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336
jennifer@guptawessler.com

*(Additional counsel listed on inside cover)*

April 22, 2024

*Counsel for Interested Parties-Appellants*

RAÙL TORREZ
Attorney General of New Mexico
BY: SETH MCMILLAN*
Deputy Solicitor General
JULIE ANN MEADE*
Deputy Attorney General
408 Galisteo St.
Santa Fe, NM 87504
(505) 490-4058

DAVID E. KOVEL
ANDREW MARTIN MCNEELA
THOMAS POPEJOY
KIRBY MCINERNEY LLP
250 Park Avenue
Suite 820
New York, NY 10177
(212) 371-6600

CANDICE J. ENDERS
MICHAEL DELL'ANGELO
MICHAEL J. KANE
BERGER MONTAGUE PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
(215) 875-4606

RICHARD JAMES LEVERIDGE
ETHAN H. KAMINSKY
GILBERT LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
(202) 772-3993

ADAM FARRA
FARRA & WANG PLLC
1300 I Street, NW
Suite 400e
Washington, DC 20005
(202) 505-5989

*Pro hac vice admission pending

# TABLE OF CONTENTS

Table of authorities ................................................................. iii

Introduction ........................................................................... 1

Jurisdictional statement ........................................................ 3

Statement of the issues ......................................................... 3

Statement of the case ............................................................ 4

    I.    Legal background ..................................................... 4

        A.    Identical factual predicate doctrine .......................... 6

        B.    Adequacy of representation ...................................... 9

    II.    Factual background and procedural history ...................... 10

        A.    Credit default swaps ................................................ 10

        B.    The New York boycott lawsuit and settlement ......................... 13

        C.    The New Mexico auction-rigging litigation ............................. 15

        D.    The New Mexico district court holds that the New Mexico funds have stated a claim. .............................. 17

        E.    The New York court grants the banks' motion to enforce the New York settlement ........................... 18

Standard of review ................................................................ 21

Summary of argument ......................................................... 22

Argument ............................................................................. 24

    I.    After over two years of actively litigating the New Mexico lawsuit, the banks' effort to bar that lawsuit comes far too late. ......... 24

    II.    The New York settlement cannot bar the New Mexico lawsuit because they do not share an "identical factual predicate." ............. 29

        A.    The New Mexico action requires "proof of further facts." ....... 29

i

B.    In concluding otherwise, the district court misunderstood the facts and misapplied the law. ................................................ 33

III.    The New Mexico funds' interests were not adequately represented in the New York action ................................................... 37

A.    Class representatives cannot represent the interest of those with claims they do not share. ......................................... 37

B.    In the absence of subclasses, the New York plaintiffs could not have adequately represented absent class members with respect to their auction claims, even if they shared those claims. ................................................ 39

IV.    To the extent the release bars the auction claims, absent class members received inadequate notice. ................................................ 45

V.    Even if the New York settlement could preclude some claims, it cannot preclude claims that accrue after it was entered. ................... 50

Conclusion ............................................................................................................ 54

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Phillips Petroleum Co.*,
    130 F.2d 593 (10th Cir. 1942)................................................................28

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997) ...........................................................9, 40, 41, 52

*American Express Co. v. Italian Colors Restaurant*,
    570 U.S. 228 (2013)...........................................................................53

*American International Group Europe S.A. (Italy) v. Franco Vago International, Inc.*,
    756 F. Supp. 2d 369 (S.D.N.Y. 2010) ................................................27

*Berghuis v. Thompkins*,
    560 U.S. 370 (2010).........................................................................24

*Boguslavsky v. South Richmond Securities, Inc.*,
    225 F.3d 127 (2d Cir. 2000) .............................................................. 4

*Bradesco Seguros, S.A. v. PPG Industries Inc.*,
    2007 WL 592025 (S.D.N.Y. Feb. 27, 2007)........................................28

*City of Rochester v. U.S. Postal Service*,
    541 F.2d 967 (2d Cir. 1976)...............................................................28

*Collins v. Harrison-Bode*,
    303 F.3d 429 (2d Cir. 2002)............................................................... 4

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) .........................................................................52

*Cooper v. Federal Reserve Bank of Richmond*,
    467 U.S. 867 (1984).........................................................................36

*Dennis v. JPMorgan Chase & Co.*,
    2021 WL 1893988 (S.D.N.Y. May 11, 2021)........................................33

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    62 F.4th 704 (2d Cir. 2023)..............................................................54

*Harkins Amusement Enterprises, Inc. v. Harry Nace Co.*,
   890 F.2d 181 (9th Cir. 1989) .................................................................53

*Hendrickson v. United States*,
   791 F.3d 354 (2d Cir. 2015)................................................................. 3

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010)................................................8, 32, 36, 38

*In re American Express Financial Advisors Securities Litigation*,
   672 F.3d 113 (2d Cir. 2011) ...................................................*passim*

*In re Auction Houses Antitrust Litigation*,
   42 F. App'x 511 (2d Cir. 2002) ........................................8, 36, 38, 44

*In re Credit Default Swaps Antitrust Litigation*,
   2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)..........................11, 13, 30, 39

*In re Credit Default Swaps Antitrust Litigation*,
   2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) .........................14, 15, 32, 39

*In re Credit Default Swaps Auctions Litigation*,
   2023 WL 3821337 (D.N.M. June 5, 2023)...................................*passim*

*In re Digital Music Antitrust Litigation*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011)....................................................36

*In re Katrina Canal Breaches Litigation*,
   628 F.3d 185 (5th Cir. 2010)................................................................49

*In re Lehman Bros. Holdings, Inc.*,
   2021 WL 4127075 (2d Cir. Sept. 10, 2021)............................................28

*In re Literary Works in Electronic Databases Copyright Litigation*,
   654 F.3d 242 (2d Cir. 2011)................................................. 9, 41, 42, 43

*In re Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices & Products Liability Litigation*,
   91 F.4th 174 (4th Cir. 2024)................................................ 6, 8, 21, 36

*In re National Life Insurance Co.*,
   2014 WL 4715880 (D. Vt. Sept. 19, 2014)............................................36

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation,*
   827 F.3d 223 (2d Cir. 2016) ............................................................*passim*

*In re Visa Check/Mastermoney Antitrust Litigation,*
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) .................................................45

*In re Western States Wholesale Natural Gas Antitrust Litigation,*
   725 F. App'x 560 (9th Cir. 2019) .......................................................36

*Kosakow v. New Rochelle Radiology Associates, PC,*
   274 F.3d 706 (2d Cir. 2001)...............................................................29

*Lawlor v. National Screen Service Corp.,*
   349 U.S. 322 (1955) ...........................................................51, 52, 53

*Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,*
   67 F.3d 20 (2d Cir. 1995) ..................................................................26

*Leopard Marine & Trading, Ltd. v. Easy Street Ltd.,*
   896 F.3d 174 (2d Cir. 2018) ..............................................................21

*Louisiana Stadium & Exposition District v. Merrill Lynch, Pierce, Fenner &
Smith Inc.,*
   626 F.3d 156 (2d Cir. 2010) ..............................................................26

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
   473 U.S. 614 (1985) ..........................................................................53

*Molski v. Gleich,*
   318 F.3d 937 (9th Cir. 2003) .............................................................49

*Morgan v. Sundance, Inc.,*
   596 U.S. 411 (2022) ..........................................................................27

*Murray v. Grocery Delivery E-Services USA Inc.,*
   55 F.4th 340 (1st Cir. 2022)....................................................41, 42, 43

*National Super Spuds, Inc. v. New York Mercantile Exchange,*
   77 F.R.D. 361 (S.D.N.Y. 1977) ...........................................................6

*National Super Spuds, Inc. v. New York Mercantile Exchange,*
   660 F.2d 9 (2d Cir. 1981)..................................................................*passim*

*Nino v. Jewelry Exchange, Inc.,*
609 F.3d 191, 209 (3d Cir. 2010) ............................................................... 27

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999) ............................................................... 41, 42, 44

*Robins Island Preservation Fund, Inc. v. Southold Development Corp.,*
959 F.2d 409 (2d Cir. 1992) ............................................................... 28

*SEC v. American Pension Services Inc.,*
833 F. App'x 152 (10th Cir. 2020) ............................................................... 29

*Springfield Hospital, Inc. v. Guzman,*
28 F.4th 403 (2d Cir. 2022) ............................................................... 22

*Stephenson v. Dow Chemical Co.,*
273 F.3d 249 (2d Cir. 2001) ............................................................... 9, 52

*Storey v. Cello Holdings, LLC,*
347 F.3d 370 (2d Cir. 2003) ............................................................... 51

*TBK Partners, Ltd. v. Western Union Corp.,*
675 F.2d 456 (2d Cir. 1982) ............................................................... 8, 30, 33, 39

*Technology in Partnership, Inc. v. Rudin,*
538 F. App'x 38 (2d Cir. 2013) ............................................................... 26

*TechnoMarine SA v. Giftports, Inc.,*
758 F.3d 493 (2d Cir. 2014) ............................................................... 53

*Twigg v. Sears, Roebuck & Co.,*
153 F. 3d 1222 (11th Cir. 1998) ............................................................... 46, 47

*U.S. D.I.D. Corp. v. Windstream Communications, Inc.,*
775 F.3d 128 (2d Cir. 2014) ............................................................... 21

*VKK Corp. v. NFL,*
244 F.3d 114 (2d Cir. 2001) ............................................................... 53, 54

*Voest-Alpine International Corp. v. Chase Manhattan Bank, N.A.,*
707 F.2d 680 (2d Cir. 1983) ............................................................... 24

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ...................................................................45

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982) ...................................................................46

*White v. Alabama*,
  74 F.3d 1058 (11th Cir. 1996) ..............................................................48

## Statutes & Rules

15 U.S.C. § 1 ..........................................................................................53

28 U.S.C. § 1291 ...................................................................................... 3

28 U.S.C. § 1292 ...................................................................................... 3

Fed. R. Civ. P. 23 ...............................................................................5, 48

## Treatises

6 Newberg & Rubenstein on Class Actions (6th ed. 2023) .....................5, 6

## Other Authorities

Kathryn Chen et al.,
  *An Analysis of CDS Transactions: Implications for Public Reporting*, Fed. Res.
  Bank of N.Y. Staff Report no. 517 (Sept. 2011).....................................12

Tobias Barrington Wolff, *Preclusion in Class Action Litigation*,
  105 Colum. L. Rev. 717 (2005)...............................................................5

## INTRODUCTION

In 2021, the New Mexico pension funds that manage the retirement accounts of the state's teachers, firefighters, and other public employees—along with the New Mexico State Investment Council, which manages the state's endowment—sued several banks. The Council and pension funds had invested in credit default swaps. And they discovered that, for years, the banks had been secretly rigging the auction that determines how much those credit default swaps pay out.

The banks litigated the funds' lawsuit in New Mexico for over two years, trying to get it dismissed on the merits. But when that effort failed, the banks tried a new tack: They argued that the funds had waived the right to bring the lawsuit in the first place. According to the banks, a years-old settlement in a New York lawsuit in which the funds were absent class members had released their claims. And therefore, the banks argued, the funds were precluded from bringing them.

The banks' argument should have failed many times over. For one thing, it was too late. Parties can't spend years litigating on the merits only to claim that the lawsuit never should have been brought in the first place.

But even if they could, the banks' effort to bar the New Mexico funds' claims runs afoul of basic, blackletter principles that govern preclusion in the class action context. A class action settlement can only bar claims that share an identical factual predicate with the settled lawsuit. And the New Mexico funds allege an entirely

different conspiracy than the one the New York lawsuit settled. The New York litigation was about credit default swap dealers—the intermediaries through whom credit default swaps are traded—conspiring to block the emergence of an exchange through which credit default swap buyers and sellers could trade directly. The New Mexico lawsuit, on the other hand, alleges that credit default swap investors repeatedly colluded to fix the auctions that determined what credit default swaps pay out. Although several large banks are both dealers and investors, these are different conspiracies to commit different misconduct with different objectives through different means that caused different harm. That's not the identical factual predicate required for preclusion.

Precluding the New Mexico funds' claims also violates the requirement, mandated by due process, that absent class members be adequately represented if a class action settlement is to bar their claims. But nobody in the New York litigation was representing the interest of those who were harmed by the banks' auction-rigging. And absent class members were never notified that if they did not opt out of the New York settlement, they risked waiving those claims.

When the banks went to the Southern District of New York, therefore, asking the court to enjoin the New Mexico lawsuit, the court should have refused. But instead it granted the injunction—an injunction that, according to the banks, is so broad that it bars claims that did not even arise until after the New York settlement

was concluded. That injunction conflicts with longstanding precedent governing class action preclusion—and due process. This Court should reverse the district court's order and vacate its injunction.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over the New York lawsuit under 28 U.S.C. § 1331 because it arose under a federal statute. It had jurisdiction over the motion to enforce the settlement agreement because its prior judgments, Docs. 539-552, "expressly retain[ed] jurisdiction over the settlement agreement." *Hendrickson v. United States*, 791 F.3d 354, 358 (2d Cir. 2015); *see In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 135 (2d Cir. 2011). The court issued its final order granting the banks' motion to enforce, as well as an injunction on January 26, 2024. SA-1. The appellants appealed on February 23, 2024. JA-907. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. *See also* 28 U.S.C. § 1292(a)(1) (providing jurisdiction over appeal of an injunction, even if interlocutory).

## STATEMENT OF THE ISSUES

1. Is a motion to enforce a settlement untimely when the movants litigated on the merits for over two years before ever mentioning the settlement?

2. Did the district court err in concluding that a suit alleging a conspiracy to rig the auction that determines what credit default swaps pay out arises from the

"identical factual predicate" as a suit alleging a conspiracy to boycott the emergence of an electronic exchange on which to trade credit default swaps?

3. Did the district court err in concluding that a subset of absent class members could be adequately represented in a class settlement if they were not separately represented and received no compensation for releasing claims the rest of the class did not share?

4. Did the district court err in concluding that absent class members received adequate notice that failure to opt out of the New York settlement would bar them from bringing auction-rigging claims, where the notice described the released claims as those relating to a conspiracy to prevent the emergence of a CDS exchange?

5. To the extent the district court enjoined appellants from bringing claims that arose after June 30, 2014, was the injunction overbroad?

## STATEMENT OF THE CASE

### I.  Legal background

A settlement between individual litigants is just a contract. *See Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002). The parties are ordinarily free to release any claims they want, whether related to the settled litigation or not. *See Boguslavsky v. S. Richmond Sec., Inc.*, 225 F.3d 127, 130 (2d Cir. 2000). But class action settlements are different. Class representatives do not settle claims solely on their own behalf; they settle on behalf of absent class members who do not "manifest the sort

of individual consent or agreement that contract law would ordinarily require." Tobias Barrington Wolff, *Preclusion in Class Action Litigation*, 105 Colum. L. Rev. 717, 765 (2005).[1]

A class action settlement, therefore, must be approved by the court, which "turn[s] the private settlement into a … judgment." 6 Newberg & Rubenstein on Class Actions § 18.19 (6th ed. 2023); *see* Fed. R. Civ. P. 23(e). It's this judgment—not the settlement contract itself—that binds absent class members. Newberg § 18.19. Thus, while "[i]ndividuals can compromise their interests in all kinds of foolish ways when they act on their own behalf, … class representatives act with the authority of the state when they compromise the interests of absentees and they must act within the limitations of that authority." Wolff, *supra*, at 765.

"[T]his authority is limited by" two longstanding doctrines rooted in due process: "the 'identical factual predicate' and 'adequacy of representation' doctrines." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 236-37 (2d Cir. 2016). Where a class action settlement release exceeds the limitations provided by these doctrines, it may not be enforced against absent class members. *Id.* at 236.

---

[1] Unless otherwise specified, all internal quotation marks, emphases, alterations, and citations are omitted from quotations throughout. Citations to "JA" are to the joint appendix; citations to "SDNY Dkt." are to the docket below, No. 13-2476 (S.D.N.Y.); and citations to "NM Dkt." are to the docket in the New Mexico district court, No. 21-606.

### A. Identical factual predicate doctrine

The identical factual predicate doctrine is a doctrine of preclusion. Newberg § 18.19. Like any other judgment, the judgment entered on a class action settlement may preclude future claims. *Id.* But the scope of that preclusion is limited: A class action settlement may preclude only those claims that share an "identical factual predicate" with the claims in the class action. *In re Am. Express Fin. Advisors*, 672 F.3d at 136-37; *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 91 F.4th 174, 183-85 (4th Cir. 2024).

This doctrine originates with this Court's seminal decision in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981) (Friendly, J.). *See In re Lumber Liquidators*, 91 F.4th at 182. The case arose out of a conspiracy to artificially depress the price of potato-futures contracts traded on the New York Mercantile Exchange. *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 77 F.R.D. 361, 362, 364 (S.D.N.Y. 1977). That conspiracy caused "one of the major defaults" in the exchange's history: the "failure to deliver on some 1,000 open futures contracts for Maine potatoes." *Id.* at 364. But the "default itself" was "not the basis for the claims asserted" in the case; the plaintiffs brought a class action on behalf of those who had already sold their futures contracts before the default, alleging that the defendants' market manipulation had artificially decreased their sale price. *See id.*; *Super Spuds*, 660 F.2d at 11. When they settled the case, however, the parties purported to release

6

not only claims premised on pre-default price manipulation, but also claims based on the default itself—that is, claims by those who were still holding futures contracts when the default occurred and who did not get the potato deliveries to which they were entitled. *Super Spuds*, 660 F.2d at 14.

This Court held that the settlement's release was impermissibly broad. Had the case proceeded to trial, the Court explained, its preclusive effect would have been limited to the facts actually at issue. *Id.* at 18. A post-trial "judgment would have barred all members of the class who had not opted out from bringing any claim based on contracts they liquidated" (i.e., sold) before the default. *Id.* But it "would not have barred members of the class from bringing any other claim they might be able to assert against the defendants, including claims based on" the default on "unliquidated" futures contracts. *Id.* That's because the named plaintiffs had never "s[ought] authority to represent members of the class with respect to claims based on unliquidated contracts," and the district court's class-certification order "did not suggest in any way that plaintiffs were authorized to represent class members with respect to any claims other than … [those] based on liquidated contracts." *Id.* at 17.

The scope of the potential judgment had the case gone to trial dictated the permissible scope of the settlement release: "If a judgment after trial cannot extinguish claims not asserted in the class complaint," Judge Friendly reasoned, "a judgment approving a settlement in such an action ordinarily should not be able to

do so either." *Id.* at 18. "Having received authority to represent class members solely with respect to liquidated contracts," the named "plaintiffs had no power to release any claims based on any other contracts." *Id.* To be sure, a class action settlement "could properly be framed so as to prevent class members from subsequently asserting claims relying on a *legal theory* different from that relied upon in the class action complaint but depending upon the very same set of facts." *Id.* at 18 n.7 (emphasis added). But, this Court emphasized, it may not bar claims "which depend not only upon a different legal theory but upon proof of further facts." *Id.*

Since *Super Spuds*, this Court—and every circuit to have considered the issue—has adhered to the rule that a class action settlement precludes absent class members' claims only to the extent that they share an "identical factual predicate."[2] Under this rule, "superficial similarity between" the settled class action and subsequent claims is "insufficient" to bar the later claims. *Hesse v. Sprint Corp.*, 598 F.3d 581, 591 (9th Cir. 2010). The subsequent claims must "depend[] upon the very same set of facts" as the settled action. *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982); *see also, e.g.*, *Hesse*, 598 F.3d at 590 (lawsuit attacking Sprint's state-tax-related surcharge not barred by prior class action settlement attacking different Sprint surcharge); *In re Lumber Liquidators*, 91 F.4th at 184–85 (settlement of consumer-protection class action

---

[2] *See, e.g.*, *In re Payment Card Interchange Fee*, 827 F.3d at 236; *In re Auction Houses Antitrust Litig.*, 42 F. App'x 511, 519 (2d Cir. 2002).

based on contaminated flooring did not bar subsequent personal injury and wrongful death claims based on the same contamination, because, while the two lawsuits "shared factual allegations," the first did not allege that the flooring caused injury or death).

## B. Adequacy of representation

Even where the identical factual predicate requirement is satisfied, absent class members cannot be bound by a class action settlement release unless their interests were "in fact adequately represented by" the class representatives and class counsel. *In re Payment Card Interchange Fee*, 827 F.3d at 236; *see Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 261 (2d Cir. 2001), *aff'd in part, vacated on other grounds in part,* 539 U.S. 111 (2003) (a court must "assess[] adequacy of representation and intra-class conflicts" before holding that absent class members' claims are precluded by a prior settlement). This Court has repeatedly held that absent class members were inadequately represented where some class members held claims that others lacked, yet all class members were represented together as a "unitary class." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011); *see In re Payment Card Interchange Fee*, 827 F.3d at 233; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).

In that situation, the inadequate representation may be "apparent from examination of the settlement itself." *Super Spuds*, 660 F.2d at 18. Where a settlement releases the claims of a subset of the class without compensating those class members

for the released claims, this Court has held that the "release [] itself" can be "proof of inadequate representation." *In re Payment Card Interchange Fee*, 827 F.3d at 237. "An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many." *Super Spuds*, 660 F.2d at 19.

## II. Factual background and procedural history

### A. Credit default swaps

A credit default swap is essentially an insurance policy on debt. *In re Credit Default Swaps Auctions Litig.*, 2023 WL 3821337, at *3 (D.N.M. June 5, 2023) [hereinafter *Auction Litig.*]. The purchaser of CDS protection pays a "premium" to the seller in exchange for the promise of a payout if some debt instrument—for example, a corporate bond—defaults. *Id.*

Consider a simplified hypothetical: A company is selling bonds to raise money. Jerry buys a $1,000 bond—basically a loan to the company—in exchange for which the company agrees to pay him annual interest and to return his $1,000 in five years. To hedge against the risk that the company defaults on its debt, Jerry (the protection buyer) pays George (the protection seller) a premium (say $50); and in return, George agrees that if the bond defaults within five years, he will pay Jerry $1,000. That's a credit default swap. If the company does not default within five years, the CDS

expires, and George owes Jerry nothing. If, on the other hand, the company goes bust in two years, George owes Jerry $1,000.

Real credit default swaps are more complex than this hypothetical. First, they are not just purchased by those seeking to insure bonds they own; they are also traded by investors speculating on the creditworthiness of a company. *Id.* As a company's risk of default increases, the price of a CDS on the company's debt should also increase. But investors might disagree with the market's assessment. Investors who believe the market has underestimated a company's credit risk will buy credit default swaps—which will be selling for a lower price than the investor believes they are worth. Similarly, an investor who believes the market has overestimated a company's credit risk will sell credit default swaps.

Second, unlike the stock market, the CDS market is "opaque." *Id.* at *4. "[T]here is no electronic exchange" like NASDAQ or the New York Stock Exchange. *Id.* A would-be buyer of CDS protection can't just call up a would-be protection seller and try to make a deal. Instead, CDS transactions happen through dealers, who act as middlemen—"sell[ing] to buyers, buy[ing] from sellers, and hold[ing] inventory until a match emerges." *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *1 (S.D.N.Y. Sept. 4, 2014) [hereinafter *Boycott Litig. I*]. These middlemen make their money by buying low, selling high, and pocketing the difference. This difference is called the "bid/ask spread." *Id.*

Finally, when a company defaults on CDS-protected debt, the CDS does not ordinarily pay out the full face value of the debt. Instead, a protection seller typically promises to pay the difference between the debt's face value and what it's worth post-default. Determining (and paying) that difference is called "settling" a CDS. *Auction Litig.*, 2023 WL 3821337, at *1, *30.

Historically, credit default swaps would settle via a physical process in which the protection buyer would deliver the defaulted bond to the protection seller, in exchange for the face value of the bond. *Id.* at *4. But as credit default swaps were increasingly used not just as insurance but as investments, there were more credit default swaps on bonds than there were bonds themselves. Kathryn Chen et al., *An Analysis of CDS Transactions: Implications for Public Reporting*, Fed. Res. Bank of N.Y. Staff Report no. 517, at 5 n.10 (Sept. 2011), https://perma.cc/ZLZ5-4EMD. So investors instead began settling credit default swaps with cash: The protection seller would simply pay the protection buyer the difference between the face value of the defaulted bond and its post-default price. *See Auction Litig.*, 2023 WL 3821337, at *4. But that requires identifying the post-default market price of the bond. *Id.*

Around 2005, several banks that were large investors in credit default swaps introduced a new method for valuing the defaulted bonds. The banks would conduct an auction among themselves in which they would bid for and trade the defaulted bonds. *Id.* at *4. The clearing price that resulted from that auction—the price at

which supply and demand for the bonds was equal—would reveal their market value. *Id.* That value would then dictate what *all* protection sellers owed protection buyers on credit default swaps on those bonds. *Id.* at *4-5.

### B. The New York boycott lawsuit and settlement

This appeal concerns two lawsuits involving credit default swaps. The first was a class action in the Southern District of New York, alleging that the dealers through which credit default swaps are bought and sold colluded to prevent the emergence of a competitor—enabling the dealers to continue to buy lower and sell higher than they could in a competitive market. *See Boycott Litig. I*, 2014 WL 4379112, at *3-*4. According to the complaint, in 2008, the Chicago Mercantile Exchange—"operator of the world's foremost derivatives marketplace"—began considering launching a CDS exchange that would have allowed CDS buyers and sellers to trade directly, rather than having to go through dealers. *Id.* at *3. Unsurprisingly, the dealers understood this as an existential threat. And so, the complaint alleged, several major dealers conspired to prevent the exchange from ever getting off the ground: boycotting any venture that would allow direct CDS trading and threatening other players in the CDS market into doing the same. *Id.* at *4-*5. The conspiracy worked. The dealers were able to prevent the exchange from launching, protect their role as intermediaries, and maintain their "inflated bid/ask spreads." *Id.* at *5.

In 2015, the parties settled. JA-411. The agreement defined a settlement class of "[a]ll persons who … purchased [credit default swaps] from or sold [credit default swaps] to the Dealer Defendants" between January 1, 2008 and September 25, 2015. JA-421. The settlement established a common fund that was distributed to class members based on the amount they overpaid (or were underpaid) when buying or selling credit default swaps. JA-427; *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *4-*5 (S.D.N.Y. Apr. 26, 2016) [hereinafter *Boycott Litig. II*]. Although the settlement fund was approximately $1.9 billion, that was still less than a quarter of the damages the plaintiffs alleged the dealers' boycott caused. *Id.* at *8.

The settlement purported to release all class members' claims "relating in any way to any conduct … occurring prior to June 30, 2014, that are alleged or that could have been alleged in the Action relating in any way to any CDS Transactions or Potential CDS Transactions." JA-423. For example, as the plaintiffs explained at the time, the settlement would bar claims based on "joint conduct by any of the Defendants that has been or could be alleged to have unfairly increased the price or widened or otherwise manipulated the spread of any CDS Transaction or Potential CDS Transaction." SDNY Dkt. 98 at 10.

The agreement defined "CDS Transactions" as:

(i) any purchase, sale, trade, assignment, novation, unwind, termination, or other exercise of rights or options with respect to any CDS, whether executed over-the-counter ("OTC") or via inter-dealer brokers, a centralized clearinghouse, a central limit order book ("CLOB"), an exchange, a swap

> execution facility (SEF), or any other platform or trading facility; or (ii) any decision to withhold a bid or offer on, or to decline to purchase, sell, trade, assign, novate, unwind, terminate or otherwise exercise any rights or options with respect to any CDS.

JA-414-15. The settlement also contained a provision granting the Southern District of New York "exclusive jurisdiction" over "any suit, action, proceeding, or dispute … relating to" the agreement or its "applicability." JA-448.

Objectors to the settlement argued that its release was overbroad because, they worried, it could be read to release antitrust claims by companies that sought to launch a dealer business of their own, SDNY Dkt. 491 at 2-3, or claims about the purchase or sale of credit default swaps after September 2015, SDNY Dkt. 496 at 3. But the district court approved the settlement anyway on the view that it was "premature" to determine what future claims it might preclude. *Boycott Litig. II*, 2016 WL 2731524, at *15. The court recognized (and the parties agreed) that the scope of the release would be circumscribed by the "identical factual predicate" and "adequacy of representation" doctrines. *Id.*; SDNY Dkt. 137 at 2 n.3 (defendants); SDNY Dkt. 503 at 38 (plaintiffs).

## C. The New Mexico auction-rigging litigation

Five years later, the New Mexico State Investment Council, along with two state pension funds, filed a lawsuit in the District of New Mexico. *Auction Litig.*, 2023 WL 3821337, at *1. The state's funds—including those that manage retirement benefits of New Mexico's teachers, firefighters, and other public employees—had

invested in credit default swaps. *Id.* They alleged that the banks that control the auctions used to settle credit default swaps had been secretly rigging them. *Id.* at *11. Rather than reflect the true market value of defaulted bonds, the funds explained, the banks—themselves investors in credit default swaps—colluded to "skew" the auctions in whatever "direction" would best "serve[] their financial interests." *Id.*

Here's how the auction conspiracy worked: Before each auction, the banks with the greatest financial stake would dictate which direction the skew should go. *Id.* Each auction would then begin with the banks submitting an "initial price" for the auctioned bonds, which was supposed to represent each bank's "private, independent, good faith view" of the price at which it would bid to buy or offer to sell a predetermined amount of debt. *Id.* at *4. But rather than honestly assessing their trading positions, each bank would submit artificially high or low submissions "to push the final auction price in the direction that serve[d] the financial interest" of the banks with the greatest stake. *Id.* at *11.

Next, the auction moved to what was supposed to be a round of "private" bidding. *Id.* at *7. But in practice, the banks coordinated their bids, relying on "encrypted messaging services like WhatsApp or Signal instead of Bloomberg chat" to avoid creating "an audit trail." *Id.* at *12. The banks were thus able to fix the valuation of the defaulted debt, guaranteeing that their credit default swaps would pay out the amount that they wanted.

Because several large banks are both CDS dealers and CDS investors, the defendants in the New Mexico auction-rigging lawsuit had also been defendants in the New York boycott litigation.[3] But the New Mexico litigation has nothing to do with the banks' participation in a conspiracy to control the buying and selling of credit default swaps; it challenges their participation in a conspiracy by CDS investors to manipulate how much credit default swaps pay out when a company defaults. *See id.* at *11. Accordingly, while the New York lawsuit was brought on behalf of anyone who bought or sold credit default swaps, the New Mexico funds sued on behalf of only those investors who "settled a credit default swap" relying on the banks' auction process to value the underlying debt. *Id.* at *29.

### D. The New Mexico district court holds that the New Mexico funds have stated a claim.

For over two years, the parties litigated the New Mexico funds' lawsuit in the District of New Mexico, as the banks attempted to get the claims dismissed on the merits. The banks' effort failed. *Auction Litig.*, 2023 WL 3821337, at *1. The court held that the funds had "adequately alleged an antitrust conspiracy" to manipulate the settlement auctions. *Id.* at *32, *35.

---

[3] The word dealer is often used as a general term to describe the banks that participate in the CDS market. Here, however, we use the word to identify the role those banks play in facilitating the purchase and sale of credit default swaps.

Just as discovery was set to begin, the banks filed their answers, asserting for the first time that the settlement in the New York boycott litigation precludes the New Mexico funds' auction-rigging claims. *See, e.g.*, NM Dkt. 191 at 101. In the two years that the parties had spent litigating the merits, the banks had not once mentioned the settlement—let alone sought to transfer the lawsuit to the Southern District of New York, where the settlement had been entered, or asked that court to enjoin the New Mexico litigation. Only once the banks lost their bid to have the New Mexico claims dismissed on the merits did they begin to argue that the claims should never have been brought in the first place.

### E.   The New York court grants the banks' motion to enforce the New York settlement.

**1.** A few months later, the banks filed a "motion to enforce" in the Southern District of New York. SDNY Dkt. 646. They asserted that the Southern District had "exclusive jurisdiction over disputes relating to the [Settlement] Release" and asked the court to "enjoin[] the New Mexico Plaintiffs from pursuing any claims based on alleged CDS-related conduct that occurred before June 30, 2014." *Id.* at 3, 24.

In their opposition, the New Mexico funds argued that it was too late: The banks could not litigate on the merits for over two years only to turn around and argue that the claims never should have been brought at all. SDNY Dkt. 661 at 3, 21-24. And in any event, the funds argued, the settlement cannot possibly bar their claims. For one thing, the two suits "are not predicated on identical facts": They

18

"concern different claims that target separate misconduct with separate impacts." *Id.* at 2.

In addition, the funds explained, New York class members were only compensated for overpaying (or receiving too little) when they bought or sold credit default swaps. *Id.* at 18. So if the settlement were construed to preclude auction-rigging claims, that means that those who were harmed by the auction conspiracy relinquished their claims for nothing—without anyone representing their interests during settlement negotiations. *Id.* at 18-19. That, the funds argued, would violate the adequate representation requirement. *Id.*

And, finally, the funds explained that the New York class notice was insufficient to allow the preclusion of their auction-rigging claims. *Id.* at 19-21. The notice told class members that they'd be releasing claims about the "legal issues in this case"—i.e. in the New York lawsuit—a case it described as challenging the dealers' conspiracy to maintain an inflated bid/ask spread on CDS trades. *Id.* The notice said nothing about auction-rigging or any claims arising from the settlement of credit default swaps after a company defaults on its debt. *See id.*

**2.** Nevertheless, the court (Cote, J.) granted the banks' motion to enforce. The court recognized that class action settlements may only preclude claims that "arise[] out of the identical factual predicate as the settled conduct." SA-14. But according to the court, it didn't matter that the New York litigation was about CDS dealers

conspiring to protect their role as intermediaries between buyers and sellers, while the New Mexico litigation challenged the banks' manipulation of the auction used to value defaulted bonds. SA-16. In the court's view, both suits were about banks conspiring to manipulate some "facet[] of the CDS market," and that was enough. SA-15.

The court rejected the funds' adequacy of representation argument, reasoning that, in exchange for the settlement fund, all class members agreed to waive "all CDS Transaction claims." SA-17. The court also held there was no notice problem because the notice defined CDS Transaction to include "any purchase, sale, trade, assignment, novation, unwind, termination, or other exercise of rights or options with respect to any CDS." *Id.* It did not address the funds' argument that this definition was insufficient in light of the notice's explanation that class members were giving up claims based on the issues raised in the case—claims the notice itself described as having to do with buying and selling credit default swaps, not settling them.

Finally, the court held that the banks had "not unreasonably delay[ed] in asserting a right to enforce the settlement" because they "pleaded the Release as an affirmative defense in their respective answers to the New Mexico operative complaint"—even though those answers came over two years into the litigation. *Id.* at *4.

The court enjoined the New Mexico funds from:

> prosecuting against the Banks any and all manner of claims, causes of action, cross-claims, counterclaims, suits, demands, actions, rights, charges, liabilities, losses, obligations, and controversies of any kind, nature, or description whatsoever, whether known or unknown, accrued or unaccrued, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, direct or derivative, whether class, individual, representative, or otherwise in nature, whether arising in law or equity or under any statute, regulation, ordinance, contract, or otherwise, for damages, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, whenever incurred, or for injunctive, declaratory, or other equitable relief, arising from or relating in any way to any conduct, acts, transactions, events, communications, occurrences, statements, omissions, or failures to act occurring prior to June 30, 2014, that are alleged or that could have been alleged in this action relating in any way to any CDS Transactions or Potential CDS Transactions.

SA-2-3.

## STANDARD OF REVIEW

The preclusive effect of a settlement is reviewed de novo. *See In re Am. Express Fin. Advisors*, 672 F.3d at 135; *In re Lumber Liquidators*, 91 F.4th at 180-81. "Where the facts are undisputed, a determination regarding waiver and estoppel is a question of law, reviewed *de novo*." *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 135 (2d Cir. 2014). And a district court's decision on laches is reviewed for abuse of discretion. *See Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 194 (2d Cir. 2018).

When reviewing an order granting an injunction, this Court "review[s] the lower court's conclusions of law *de novo* and its ultimate decision for abuse of discretion." *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 415 (2d Cir. 2022).

## SUMMARY OF ARGUMENT

The district court's order precluding the New Mexico funds' claims violates longstanding, blackletter law governing claim preclusion in the class action context—several times over.

**I.** As a threshold matter, the banks' motion to enforce the New York settlement came two years too late. Parties may not waste their opponents'—and the court's—time and resources by litigating on the merits for years, only to turn around and argue that the case never should have been brought at all.

**II.** Even if the banks could invoke the New York settlement years into litigation, that agreement can't bar the New Mexico funds' claims. Due process prohibits the preclusion of absent class members' claims unless the claims share an "identical factual predicate" with the released conduct, and the absent class members were adequately represented during the settlement. *In re Am. Express Fin. Advisors*, 672 F.3d at 136. Neither is true here.

Start with identical factual predicate. The New York lawsuit alleged that CDS dealers colluded to prevent the emergence of a competitor that would have threatened their role as intermediaries between CDS buyers and sellers—and the

inflated bid/ask spreads the dealers extracted per trade in that role. The New Mexico complaint, in contrast, alleges that to increase their profit as CDS investors, the banks rigged the auctions that determine the value of defaulted debt—and therefore what a CDS on that debt will pay out. Far from resting on identical facts, these are different conspiracies, pursued in different ways for different ends, that caused different injuries. That alone is sufficient to bar preclusion.

**III.** But there's also an adequacy of representation problem. Nobody in the New York litigation represented the interests of those harmed by the bank's auction-rigging. That's unsurprising. The case was about buying and selling credit default swaps, not settling them. And the distribution of settlement proceeds reflects that: It only compensated class members for buying or selling credit default swaps at supracompetitive prices; it offered no compensation for receiving a rigged payout when a company defaulted on its debt. A settlement cannot bar absent class members from bringing claims for which they were neither compensated nor represented.

**IV.** Nor can they be precluded from bringing claims without adequate notice. The New York settlement notice told class members that they were releasing claims related to the boycott lawsuit—that is, claims about dealers boxing out competitors and maintaining supracompetitive bid/ask spreads, not claims about banks padding their investment profits through auction-rigging.

**V.** Finally, even if the New York settlement could preclude some of the New Mexico claims, it cannot preclude any claim arising after the settlement was entered. The identical factual predicate, adequacy of representation, and notice problems are even more severe with respect to claims that didn't even exist when the New York litigation settled. And allowing parties to enter agreements insulating them from future antitrust liability violates public policy, not to mention the antitrust laws themselves.

## ARGUMENT

### I. After over two years of actively litigating the New Mexico lawsuit, the banks' effort to bar that lawsuit comes far too late.

For two years, the banks litigated the merits of the New Mexico funds' claims—an effort that the New Mexico district court noted required "atypically lengthy briefing" and "significant energy" from the funds and the court. NM Dkt. 230 at 1. But when the district court ruled against them, the banks suddenly pivoted, arguing that the funds' claims were precluded by a settlement agreement the banks had known about the entire time but never mentioned. In other words, the banks spent years arguing about the merits only to turn around and argue that the merits never mattered in the first place. The law prohibits such gamesmanship.

Where a party's actions are "inconsistent" with an intent to enforce a right, that right is deemed waived. *See Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir. 1983); *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010) ("As a

general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."). That's this case. A party that intends to enforce a settlement precluding claims does not litigate those claims on the merits for years.

The banks have offered no convincing reason why they didn't go to the Southern District asking for an injunction two years earlier, when the New Mexico lawsuit was first filed. After all, the New York settlement grants the Southern District of New York "exclusive jurisdiction" over "any suit, action, proceeding, or dispute . . . relating to" the settlement agreement. JA-448. If the banks truly believed that the New Mexico claims were related to the New York settlement, then litigating a motion to dismiss on the merits in New Mexico violated the settlement agreement.

Below, the banks asserted that their goal was "to minimize litigation," SDNY Dkt. 665 at 10, by first focusing on a motion to dismiss that, "if granted, would have caused the entire case to be dismissed," SDNY Dkt. 646 at 24. But now that the Southern District has granted them an injunction, the banks contend that enforcing the settlement *also* requires the New Mexico funds' entire complaint to be dismissed—and have asked the New Mexico court to give them a second chance at doing so. JA-918. A course of action that requires three motions in two jurisdictions and an appeal before discovery can even begin is not efficient. And even if it were,

efficiency can't explain why the banks didn't even mention the settlement agreement in the two years they were litigating in New Mexico—that would at least have allowed the court and the funds to weigh in on the best method of proceeding. Nor does it explain why the banks thought it permissible to file a motion to dismiss on the merits in New Mexico if they believed that the Southern District had exclusive jurisdiction over the claims.

The only possible explanation for the banks' conduct is that either they never really believed that the New York settlement precluded the New Mexico claims or they preferred that the New Mexico claims be dismissed on the merits, so that even parties who were not class members of the New York litigation could not bring them. Either way, the banks forced the funds and the court to spend years litigating claims on the merits before asserting a right not to face those claims at all. Courts routinely hold that similar conduct constitutes waiver. *See, e.g.*, *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159-60 (2d Cir. 2010) (waiver where the parties were "nearly a year into the litigation" and opposing party had won "several key procedural victories"); *Tech. in P'ship, Inc. v. Rudi*n, 538 F. App'x 38, 40 (2d Cir. 2013) (waiver based in part on "a year litigating a motion to dismiss on the merits, all while having knowledge" of the right not invoked)*; Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 26 (2d Cir. 1995) (waiver where party "could have invoked" the right "at the outset … but chose not to" for seven months);

*Am. Int'l Grp. Eur. S.A. (Italy) v. Franco Vago Int'l, Inc.*, 756 F. Supp. 2d 369, 379 (S.D.N.Y. 2010) (waiver where party waited over eleven months to invoke right, while actively litigating other defenses).[4]

The district court held that it didn't matter how long the banks delayed because, once their motion to dismiss was denied, they raised the New York settlement as an affirmative defense in their answers. SA-18. But this is entirely unresponsive to the banks' failure to raise this argument at the *outset* in the Southern District, the only forum where the banks say it could be adjudicated. And waiver can't be cured retroactively by asserting an affirmative defense years later. *Cf. Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 209, 211 (3d Cir. 2010) (holding that defendant waived right to arbitrate by litigating in court for fifteen months, even though it asserted the arbitration clause as an affirmative defense in its answer). If a litigant acts inconsistently with the intent to enforce a right, that right is waived. That's exactly what the banks did here.

For similar reasons, the banks' belated motion to enforce the New York settlement is also barred by laches. Laches prevents a party from seeking equitable relief where their "unreasonabl[e] delay[]" "prejudiced" the opposing party. *Robins*

---

[4] Several of these cases involved arbitration, which until recently required an additional element for waiver not present here: prejudice. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 413 (2022). But even under that higher standard, courts routinely held that conduct like the banks' here constituted waiver.

*Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 423 (2d Cir. 1992). The banks' two-year delay in moving to enforce the New York settlement in favor of litigating on the merits in New Mexico was unreasonable—a party may not sit on their rights in the hopes of achieving a more favorable result through some other means. *See City of Rochester v. U.S. Postal Serv.*, 541 F.2d 967, 977 (2d Cir. 1976) (delay unreasonable where parties were aware of the claim yet failed to act); *Alexander v. Phillips Petroleum Co.*, 130 F.2d 593, 605 (10th Cir. 1942) (delay unreasonable where party strategically delayed in asserting equitable right). And the banks have offered no valid excuse for that behavior. *See supra* pages 25-26.

The funds were prejudiced as a result of the banks' delay. They were forced to invest significant time, money, and effort to responds to an atypically complex motion to dismiss on the merits that—under the banks' view—never should have been litigated at all. And, according to the banks, they now need to do it all over again. *See In re Lehman Bros. Holdings, Inc.*, 2021 WL 4127075, at *4 (2d Cir. Sept. 10, 2021) (prejudice where party's delay "forced [its opponent] to engage in unnecessarily protracted and … costly additional … litigation"); *Bradesco Seguros, S.A. v. PPG Indus. Inc.*, 2007 WL 592025, at *3 (S.D.N.Y. Feb. 27, 2007) (delay prejudicial where party "might very well have engaged in a different litigation strategy" absent delay).

Equitable estoppel, too, bars the banks' gambit. Equitable estoppel prevents a party from raising a defense where doing so would "work an injustice upon the other

28

party due to the latter's justifiable reliance upon the former's … conduct." *Kosakow v. New Rochelle Radiology Assocs., PC*, 274 F.3d 706, 725 (2d Cir. 2001). Again, in reliance on the banks' conduct, the funds spent time and money litigating the banks' motion to dismiss. Had they known that the banks intended to argue that the settlement barred the lawsuit entirely, they could have sought to have that (simpler) argument heard first. *See, e.g., SEC v. Am. Pension Servs. Inc.*, 833 F. App'x 152, 155, 157 (10th Cir. 2020) (defendant equitably estopped from enforcing settlement agreement when she "needlessly delayed for nearly 17 months while the [other party] expended resources" in litigation).

Under any of these doctrines—waiver, laches, or equitable estoppel—the outcome is the same: The banks may not seek to enforce a settlement that they steadfastly refused to mention for over two years. At best, they slept on their rights. At worst, they actively misled the New Mexico funds—and the New Mexico district court—in an attempt to secure a favorable ruling on the merits, drag out this litigation, and make it more costly for the plaintiffs. That gamesmanship should not be rewarded.

## II. The New York settlement cannot bar the New Mexico lawsuit because they do not share an "identical factual predicate."

### A. The New Mexico action requires "proof of further facts."

The New York class settlement cannot bar the New Mexico claims because the claims do not share an "identical factual predicate." *In re Am. Express Fin. Advisors.*,

672 F.3d at 136. Claims have an "identical factual predicate" only when they "depend[] upon the *very same* set of facts." *TBK Partners*, 675 F.2d at 460 (emphasis added). So if a subsequent suit would require "proof of further facts," it cannot be precluded by a prior class settlement's release. *Id.* at 462. That's the case here. Indeed, proving the New Mexico action will require not just "further facts" beyond the New York action, but entirely different facts. The suits involve different conspiracies, pursued for different ends, injuring different parties, in different ways.

Begin with the conspiracies themselves. The New York action alleged that CDS dealers colluded to prevent the emergence of a competitor that would have enabled protection buyers to purchase credit default swaps directly from protection sellers—without any need for a dealer to facilitate the trade. *Boycott Litig. I*, 2014 WL 4379112, at *4. The New Mexico action, on the other hand, alleges that banks that invested in credit default swaps conspired to rig the auctions that determine the value of defaulted debt—and therefore what credit default swaps on that debt will pay out. *Auction Litig.*, 2023 WL 3821337, at *1.

These conspiracies had different motives. The purpose of the New York conspiracy was to maintain the dealers' status as intermediaries, so they could extract a supracompetitive bid/ask spread on each trade. What a CDS might pay out if the debt defaulted was irrelevant; all that mattered was buying low and selling high. Conversely, the whole point of the New Mexico conspiracy was to manipulate what

credit default swaps paid out, so that the banks that invested in them could increase their investment profit.

The conspiracies also injured different parties. The New York conspiracy injured anyone who traded credit default swaps through the conspiring dealers, which is why the New York class included anyone who "purchased CDS from or sold CDS to" the dealers. JA-421. But the New Mexico conspiracy injured only those investors who held credit default swaps that were settled through the banks' auction process after the underlying debt defaulted. The New Mexico funds thus seek to represent a class of anyone who "settled a credit default swap … by reference to the [] credit default swap auction protocol." *Auction Litig.*, 2023 WL 3821337, at *29.

These classes form a Venn diagram—not a circle. Most companies never default on their debt, so most credit default swaps never have to be settled; they simply expire. Although thousands of credit default swaps have been traded since 2005, there have only been about 180 settlement auctions. JA-773. If a trader bought or sold a CDS through one of the dealers involved in the boycott conspiracy, but the underlying debt did not default, that trader would have been harmed by the boycott, but not the auction conspiracy. On the other hand, an investor who acquired a CDS without going through one of the defendants in the New York litigation may not have been harmed by the boycott. But if the debt underlying that CDS defaulted, they would have been harmed by the auction conspiracy. Only investors who

purchased credit default swaps (1) from one of the conspirators in the boycott action; (2) on a company that later defaulted while the investor still held the swap; and (3) that settled via the auction process would have been injured by both conspiracies.

Finally, the conspiracies injured these different groups in different ways. Because the boycott conspiracy injured traders at the point of sale, the harm they suffered depended on the number of trades they performed, along with the amount the dealers were able to unfairly extract per trade. The New York settlement fund, therefore, was distributed based solely on the number of CDS trades a class member had executed during the settlement period and an economic model estimating the per-trade overcharge. *Boycott Litig. II*, 2016 WL 2731524, at *4-*5. Class members' compensation had nothing to do with how (or even whether) their credit default swaps settled. *See id.* But in the New Mexico action, that's all that matters. The harm suffered by the victims of the auction conspiracy is the difference between the payout they got from the banks' rigged auction and what they would have received from a fair one.

Of course, the suits have some similarities. Some of the largest banks in the world were involved in both conspiracies. Both involve credit default swaps. Both are identified by case names beginning with the phrase "*In re Credit Default Swaps.*" But these "superficial similarit[ies]" are "insufficient to justify the release of the later claims by the settlement of the former." *Hesse*, 598 F.3d at 591.

32

The factual basis of the lawsuits differs on just about every level—from the goal, to the unlawful actions, to the injury. The New Mexico funds will need to show that the defendants colluded to rig the auctions used to value defaulted debt. They'll need to prove that they held a CDS on that debt at settlement. They'll need to show that the final valuations in the auctions were distorted. And they'll need to show that they received (or paid) too little (or too much) on each settlement because of the banks' rigged auction. Those are not only "*further* facts," but "an entirely separate set of facts" from those alleged in the New York boycott lawsuit. *Dennis v. JPMorgan Chase & Co.*, 2021 WL 1893988, at *6 (S.D.N.Y. May 11, 2021) (emphasis added). The settlement of that lawsuit, therefore, cannot preclude the New Mexico funds' auction claims. *TBK Partners*, 675 F.2d at 462.

## B. In concluding otherwise, the district court misunderstood the facts and misapplied the law.

The district court held that the New Mexico action "share[s] an identical factual predicate with the Released claims" because "[b]oth sets of claims are predicated on the Banks conspiring to manipulate the CDS market." SA-15. That misunderstands the facts and the law.

On the facts, the district court mistakenly believed that both lawsuits alleged a conspiracy "to manipulate [CDS] *prices*." SA-16 (emphasis added). But only the boycott conspiracy alleged in the New York action impacted the price of credit default swaps. The bond auction-rigging alleged in the New Mexico action impacted

33

the payout of credit default swaps, not what they cost. This misunderstanding permeated the district court's analysis. For example, the court thought that the New York settlement fund was distributed to class members to compensate them in part for the banks' auction conspiracy. SA-16-17. But the fund was distributed based only on harm the class members suffered when buying or selling credit default swaps— not harm they suffered when those swaps settled for rigged payouts. *Boycott Litig. II*, 2016 WL 2731524, at *4-*5.

On the law, the district court erred by analyzing the allegations at too high a level of generality. Foundational to the district court's reasoning was its belief that "[b]oth sets of claims … are predicated on the Banks conspiring to manipulate the CDS market." SA-15. On that view, a settlement in a lawsuit alleging that Apple and Samsung fixed the price of new smartphones would preclude a suit alleging that they conspired to crush an upstart smartphone repair company. After all, both conspiracies would involve trying to extract supracompetitive "prices" from the "smartphone market." But the conspiracies would use different means to affect different prices paid by different (if overlapping) groups. The background facts needed to understand these antitrust violations might overlap, but the operative facts necessary to prove them would barely overlap at all. That is not an identical factual predicate.

Indeed, this Court has repeatedly held that claims that share far more than background facts—claims resting on the *exact same* unlawful activity—do not share an identical factual predicate if the unlawful activity impacted different groups in different ways. For example, take this court's seminal decision in *Super Spuds*. There, both complaints "alleged the same types of wrongful actions"—the defendants' manipulation of the market for potato futures. 660 F.2d at 12. But whereas the initial lawsuit alleged harm to investors who liquidated their futures contracts, the subsequent lawsuit alleged harm to those with unliquidated contracts. *Id.* at 12. Because the subsequent claims would therefore require "proof of further facts," this Court held that they could not be released. *Id.* at 18 & n.7.

The same is true of *In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113 (2d Cir. 2011). In that case, both lawsuits alleged that the defendant banks fraudulently failed to act in their clients' best interests. *Id.* at 119-20, 122. But the settled class action alleged that the defendants did so by selling "financial plans … designed to steer [class members] into investing in [the banks'] propriety … products," while the subsequent action alleged that the banks had made riskier investments than promised. *Id.* at 137-38. This Court held that the settled class action could not bar claims in the subsequent suit that challenged misconduct beyond the defendant's practice of "steering … clients" into its proprietary funds. *Id.* at 138.

35

The list goes on. *See In re Auction Houses Antitrust Litig.*, 42 F. App'x at 519 (suits rested on different factual predicates despite being based on the "same conspiracy to fix prices," because one alleged harm to U.S.-based auctions, whereas the other alleged harm to foreign auctions); *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 725 F. App'x 560, 561, 563 (9th Cir. 2019) (suits challenging "same manipulative conduct" did not share an identical factual predicate because one alleged overpayment for physical natural gas, whereas other alleged overpayment for natural gas futures); *Hesse*, 598 F.3d at 589 (settlement release could not bar subsequent claims "brought to remedy a different set of injuries").[5]

The factual predicates here are far more distinct than in any of these cases. Here, the claims involve different conspiracies to commit different misconduct for different reasons causing different injuries. That is not what "identical" means.

---

[5] *See also In re Lumber Liquidators*, 91 F.4th at 184-85 (no preclusion even though both suits alleged that defendant fraudulently concealed carcinogenic product because the lawsuits alleged different harms); *In re Digit. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 399-400 (S.D.N.Y. 2011) (class settlement in lawsuit alleging conspiracy to maintain higher CD prices could not preclude suit alleging conspiracy to manipulate the price of internet music, even though both conspiracies sought to inflate CD prices); *In re Nat'l Life Ins. Co.*, 2014 WL 4715880, at *5 (D. Vt. Sept. 19, 2014) (class settlement challenging insurance-premium fraud could not bar subsequent suit for insurance payout); *cf. Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 876-77 (1984) (judgment in class action challenging employer's discriminatory practices did not preclude class member from bringing subsequent suit alleging an individual claim of discrimination); *Xantech Corp. v. Ramco Indus., Inc.*, 159 F.3d 1089, 1093 (7th Cir. 1998) (no claim preclusion even though "facts underlying [the prior] suit" were "relevant as background to" subsequent suit because the overlapping facts "did not give rise to the damages of which [the subsequent plaintiff] complain[ed]").

36

Indeed, the banks' two-year delay in asking the Southern District to enjoin the New Mexico claims is "powerful evidence" that even the banks themselves do not seriously "believe that the settlement bar[s]" the funds' claims. *W. Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d 29, 34 (2d Cir. 1996).

## III. The New Mexico funds' interests were not adequately represented in the New York action.

Even if the New Mexico action rested on the same factual predicate as the New York action, the New York settlement still could not preclude the funds' auction claims. That's because absent class members cannot be precluded from bringing released claims unless they were "in fact adequately represented" by the class representatives. *In re Payment Card Interchange Fee*, 827 F.3d at 236; *see Stephenson*, 273 F.3d at 261 (absent class members "cannot be bound" by prior class settlement if they were "inadequately represented"). Nobody in the boycott litigation even attempted to represent the interests of those harmed by the banks' auction manipulation—let alone adequately. That's obvious from the settlement itself: To the extent the settlement precludes auction claims, class members holding these claims received nothing in exchange.

### A. Class representatives cannot represent the interest of those with claims they do not share.

"The most fundamental principles underlying class actions limit the powers of the representative parties to the claims they possess in common with other members

of the class." *Super Spuds*, 660 F.2d at 16. By definition, if the class representatives do not "possess the same interest and suffer the same injury as class members," they cannot adequately represent absent class members with respect to that injury. *Amchem*, 521 U.S. at 625-26. Put another way, "named plaintiffs in a class action cannot represent a class of whom they are not a part." *Super Spuds*, 660 F.2d at 17; *see also In re Auction Houses Antitrust Litig.*, 42 F. App'x at 518-19 (class settlement could not "impair[]" claim held by only a subset of class members that was "not within the description of claims assertable by the class"); *Hesse*, 598 F.3d at 589 (class settlement could not release subsequent claim because named plaintiff "did not share" the relevant claim).

The banks have not even attempted to argue that *any* of the class representatives in the New York action held credit default swaps that were settled by a rigged auction. And there's no evidence that they did. The New York complaint alleges that the CDS dealers' boycott conspiracy injured the named plaintiffs, who were forced to buy (or sell) credit default swaps from the dealers at an inflated (or deflated) price. JA-319. The complaint does not allege that any named plaintiff held credit default swaps on debt that ultimately defaulted—let alone that any named plaintiff held a CDS that was settled through one of the banks' rigged auctions. When litigating the New York action, the banks characterized the case as concerning a "massive anticompetitive scheme … in *trading* credit default swaps." SDNY Dkt. 290

38

at 1 (emphasis added). They said nothing about how those swaps settled. The district court, too, never mentioned the New York plaintiffs settling any credit default swaps via auction. *See, e.g.*, *Boycott Litig. I*, 2014 WL 4379112; *Boycott Litig. II*, 2016 WL 2731524.

The New York named plaintiffs can't have adequately represented the New Mexico funds with respect to the auction claims if they themselves didn't possess those claims. Otherwise, class representatives and their counsel could "endeavor to obtain a better settlement by sacrificing the claims of others at no cost to themselves by throwing the others' claims to the winds." *TBK Partners*, 675 F.2d at 462.

### B. In the absence of subclasses, the New York plaintiffs could not have adequately represented absent class members with respect to their auction claims, even if they shared those claims.

Even if some of the named plaintiffs in the New York lawsuit might have had claims against the banks for their auction conspiracy, the New Mexico funds' interests in those claims still could not have been adequately represented. That's because the New York named plaintiffs represented the class as a whole, but not all New York class members were harmed by the auction conspiracy. Absent separate representation of those class members who were, there was no way to ensure that their claims were not impermissibly traded for greater relief for the class as a whole. Indeed, to the extent the New York settlement precludes the auction claims, that's precisely what happened.

**1.** As both this Court and the Supreme Court have made clear, when the interests of absent class members are "not aligned," due process requires "structural assurance of fair and adequate representation [of] the diverse groups and individuals affected" through subclassing. *Amchem*, 521 U.S. at 627. In *Amchem*, for example, the Supreme Court vacated class certification of a settlement of "current and future asbestos-related claims." *Id.* at 597. The proposed class encompassed anyone who had been exposed to certain asbestos products—whether or not their injuries had yet manifested. *Id.* But the settlement did not break those two groups—class members who had already manifested asbestos-related injuries and those who had not—into subclasses. *Id.* at 626. Instead, it sought to represent them as a "single giant class." *Id.*

The Court held that failure was fatal to certification. *Id.* The Court explained that "the interests of those within the single class [were] not aligned" because the subgroups would have had conflicting goals. *Id.* "[F]or the currently injured, the critical goal [was] generous immediate payments." *Id.* But for the "exposure-only plaintiffs," "ensuring an ample, inflation-protected fund for the future" was paramount. *Id.*

It made no difference that there were named plaintiffs who fell within both groups. *Id.* at 602-03, 627. In the absence of subclasses, those named plaintiffs "each served generally as representative for the whole, not for a separate constituency." *Id.* at 627. "[E]ach subgroup" in a class, the Court explained, "cannot be bound to a

settlement except by consents given by those who understand that their role is to represent *solely* the members of their respective subgroups." *Id.* (emphasis added).

The Supreme Court reaffirmed this rule in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). Once again, the Court held that representatives of a unitary class could not adequately represent the interests of class members given the "potentially conflicting interests of easily identifiable" subgroups. *Id.* at 831-32. This was so even though the settlement treated each class member the same. In fact, "[t]he very decision to treat them all the same" despite their differences was "itself an allocation decision with results almost certainly different from the results that" the subgroups "would have chosen" had they been adequately represented. *Id.* at 857; *see also Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 346 (1st Cir. 2022) ("An agreement that gives the same monetary remedy to all members of the class, despite significant differences in the nature of their claims … may not be fair and reasonable.").

Applying that precedent, this Court, too, has recognized that subclasses are necessary to ensure that all class members are adequately represented whenever there are "disparate interests" within a class. *In re Literary Works*, 654 F.3d at 251. *Literary Works* involved a unitary class with claims that could be divided into three categories, each varying in strength. *Id.* at 251. Class members with different combinations of claims thus had different interests—each would have wanted to distribute the settlement fund so that their claims received the most money. *Id.* This

Court held that "[o]nly the creation of subclasses, and the advocacy of an attorney representing each subclass c[ould] ensure that the interests of [each] particular subgroup are in fact adequately represented." *Id.* at 252; *see In re Payment Card Interchange Fee*, 827 F.3d at 237 (similar); *Murray*, 55 F.4th at 347-49 (similar).

The same is true here. The New York class—investors who bought or sold credit default swaps from CDS dealers during the class period—divides neatly into two "easily identifiable categories," *Ortiz*, 527 U.S. at 832: class members who settled credit default swaps via the banks' rigged auction, and those who did not. And just as in *Literary Works*, the interests of those class members diverge. Class members who settled credit default swaps via the rigged auctions would care about releasing those claims, but class members who didn't would not. That "intra-class conflict … presents an actual and substantial risk of skewing available relief in favor of some subset of class members." *Murray*, 55 F.4th at 346. It would be in the self-interest of the subgroup without auction claims to release those claims for less than they're worth to extract a larger settlement fund for everyone—and to allocate the settlement fund equally to all class members, even though the auction-rigging subgroup suffered more harm.

In the absence of any "structural assurance" of adequate representation that would have been achieved by subclassing, there is no way to know whether "the class representatives or class counsel may have sold out" the subgroup with auction claims

"by allocating some of their fair share" of the settlement fund "to other class members." *Id.* at 345. The New Mexico funds were thus inadequately represented in the New York settlement with respect to those auction claims, meaning those claims cannot be precluded. *See In re Payment Card Interchange Fee*, 827 F.3d at 236.

The district court's contrary holding relied on its belief that all class members' interests were aligned because all "claim[ed] that they were harmed by the Banks' manipulation of prices in the CDS market." *See* SA-17. But that misses the point. Although the interests of class members were aligned with respect to the "supracompetitive *prices*" for credit default swaps caused by the banks' boycott, SA-16 (emphasis added), they were misaligned with respect to the banks' rigged auctions. All class members, by definition, were harmed by the boycott, but only some class members had auction-rigging claims. That's the (mis)alignment that's relevant here.

**2.** And that intra-class conflict is apparent in the compensation that class members received for (purportedly) waiving their auction claims: Nothing. *See In re Literary Works*, 654 F.3d at 252 (examining settlement's substance "for evidence of prejudice to the interests of a subset of plaintiffs"); *accord In re Payment Card Interchange Fee*, 827 F.3d at 236; *Super Spuds*, 660 F.2d at 18. The New York settlement compensated class members solely for buying or selling credit default swaps at inflated (or deflated) prices—it did not offer any compensation for those whose CDS payouts were manipulated by the banks' rigged auctions. So two class members who

43

purchased the same CDS on the same day would receive the same compensation under the settlement, even if one of those class members held the CDS at the time it settled via auction (and was thus harmed by the auction conspiracy) and the other did not.

This Court and the Supreme Court have consistently recognized that where a group of absent class members is expected to give up their claims and receive nothing in return, they have been inadequately represented. *See, e.g.*, *Ortiz*, 527 U.S. at 857; *Super Spuds*, 660 F.2d at 19 (inadequate representation "apparent" where "a class member holding one liquidated and one unliquidated contract receives no more than another class member holding only one liquidated contract"); *In re Payment Card Interchange Fee*, 827 F.3d at 238 (inadequate representation where "class counsel trad[ed] the claims of many … for relief they cannot use"); *In re Auction Houses Antitrust Litig.*, 42 F. App'x at 519 (inadequate representation where subgroup's claims were "impair[ed]" without compensation).

In the district court's view, the auction claims *were* compensated because "the settlement class plaintiffs agreed to release all CDS Transaction claims, known and unknown, in exchange for compensation." SA-17. But it's not enough to say that all class members accepted the same deal. The problem is that the deal required some class members—those with auction claims—to give up far more than others. *See Ortiz*, 527 U.S. at 857. In practice, then, class members with auction claims were

44

"targeted for worse treatment" than those without. *In re Payment Card Interchange Fee*, 827 F.3d at 237. That's inadequate representation. And "[w]here class plaintiffs have not adequately represented the interests of class members," even "[c]laims arising from a shared set of facts will not be precluded." *Id.*[6]

## IV. To the extent the release bars the auction claims, absent class members received inadequate notice.

If a class settlement is to bind absent class members, due process requires that class members first be provided with adequate notice of the scope of the settlement, the release, and their rights under both. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 395 (1996). These notices are vital because "[a]bsentee class members will generally have had no knowledge of the suit until they receive the initial class notice." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104 (5th Cir. 1977). So the notice

---

[6] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005), on which the banks relied below, is not to the contrary. In that case, this Court held that a settled class action could preclude lawsuits that alleged the same harm—even though the lawsuits alleged different legal theories. *See id.* at 113; *compare id.* at 101 (plaintiffs in settled class action "claimed that they incurred supra-competitive 'interchange fees' . . . during every debit and credit card transaction") *with In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 513 (E.D.N.Y. 2003) ("*Reyn's* is a virtual clone" of settled lawsuit, challenging "elevated intercharge rates"); *id.* at 515 ("The effect of these rules, [the other lawsuit] allege[s], is inflated prices for credit card transactions."). Although objectors contended that the "class recovery was too low," *Wal-Mart*, 396 F.3d at 113, they "did not allege divergent interests," *In re Payment Card Interchange Fee*, 827 F.3d at 237. Here, in contrast, class members that held auction claims suffered harm that wasn't alleged in (or compensated by) the New York lawsuit and, therefore, had "divergent interests" from the New York class members that lacked those claims.

"will be their primary, if not exclusive, source of information for deciding how to exercise their rights." *Id.*

To comport with due process, then, a notice must alert absent class members to "the options that are open to them in connection with the proceedings." *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982). And it must be understandable to the "average class member." *In re Am. Express Fin. Advisors*, 672 F.3d at 130. Where a notice fails to "adequately apprise class members" that failing to opt out of the class will release certain claims, the settlement cannot preclude absent class members from asserting those claims in the future. *Super Spuds*, 660 F.2d at 16 (notice violated due process because it "did not adequately apprise class members" that their claims "were being placed on the block"); *Twigg v. Sears, Roebuck & Co.*, 153 F. 3d 1222, 1227 (11th Cir. 1998) (class settlement could not preclude claims due to inadequate notice).

The class notice here would not have communicated to an average class member that failing to opt out would release claims related to the banks' rigged auctions. The notice repeatedly tells class members that failing to opt out will release claims "about the legal issues *in this case*"—i.e. the New York boycott lawsuit. JA-516, 522, 525 (emphasis added). And "this case," the notice explains, is "about" allegations that "Defendants engaged in anticompetitive acts that affected the *price* of" credit default swaps by "conspir[ing] to prevent exchange trading." JA-518 (emphasis added); *accord* JA-516, 518. The notice then tells class members that this

46

"anticompetitive conduct" harmed them by "artificially inflat[ing] the spreads on all CDS transactions throughout the Class Period." JA-521; *accord* JA-518. And, it says, they will receive damages based on "the amount of inflation of the spreads" on their CDS trades. JA-521.

In other words, over and over again, the notice informs class members that what they are giving up is the right to bring claims alleging that the defendant banks extracted a supracompetitive spread on the purchase and sale of credit default swaps. Of course, CDS *payouts* don't have a spread. And nowhere does the class notice say anything about CDS settlement—or the banks' conspiracy to rig the auctions on which CDS settlement payouts are based.

This notice gave absent class members no indication that they might be releasing claims based on harm caused by a rigged settlement auction. To the contrary, it affirmatively led them to believe otherwise. That is not adequate notice. *See, e.g.*, *Super Spuds*, 660 F.2d at 13-14, 17 (notice that "referred only to claims based on liquidated contracts" and "gave no indication that the action would concern any other claims" "did not fairly apprise" class members that claims based on unliquidated contracts would be released, even though notice referred class members to settlement agreement that by its terms, released those claims); *Twigg*, 153 F.3d at 1228 (prior class action could not preclude subsequent suit because notice's

47

characterization of the class claims did not "adequately inform an absent class member … that claims like his were being litigated").

The district court held otherwise solely because the class notice reprinted the technical definition of "CDS Transaction" that is contained in the settlement agreement: "any purchase, sale, trade, assignment, novation, unwind, termination, or other exercise of rights or options with respect to any CDS." SA-17. But that is not enough. For one thing, that definition is legalese. *See* Fed. R. Civ. P. 23(c)(2)(B) (requiring notice to be in "plain, easily understood language"); *White v. Alabama*, 74 F.3d 1058, 1066 n.27 (11th Cir. 1996) (criticizing notice for being "couched in legalese"). But when the notice speaks in plain terms, it repeatedly uses the term "CDS Transaction" in ways that would *exclude* CDS settlements. For example, it says: "Defendants' conduct harmed Settlement Class Members by … maintaining inflated bid/ask spreads on CDS Transactions." JA-518; *see also* JA-521 ("Plaintiffs allege that Defendants' anticompetitive conduct artificially inflated the spreads on all CDS transactions."); *id.* ("[E]xperts … constructed a model to identify the amount of inflation of the spreads on any given CDS transaction"). Again, there is no "bid/ask spread" on a CDS settlement payout.

The notice also instructs class members who seek to opt out to send a letter "identify[ing] any and all CDS Transactions" in which they "purchased CDS from or sold CDS to any of the Dealer Defendants" during the class period—not any

48

"transactions" in which a CDS they held settled via auction. JA-522. To the extent the technical definition of CDS Transactions included settlement payouts, the notice misled class members into thinking otherwise.

Furthermore, that technical definition is simply printed at the top of the notice; it is not included in the part of the notice, several pages later, that tells class members what claims they are releasing. *See* JA-516, 522. Again, the part of the notice that actually tells class members what claims they are releasing says that it is claims "about the legal issues *in this case*." JA-522 (emphasis added). *Cf. In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 198 (5th Cir. 2010) (notice unreasonable because it "was misleading"); *Molski v. Gleich*, 318 F.3d 937, 952 (9th Cir. 2003), *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010) (holding that a notice was inadequate where it "misled the putative class members" about the scope of the release).

The notice did not give absent class members any reason to think that, by failing to opt out of the New York lawsuit, they would lose the ability to sue the banks for their auction-rigging conspiracy. Enforcing the settlement's release against class members trying to recover what they lost from the banks' auction-rigging would thus violate due process.

**V. Even if the New York settlement could preclude some claims, it cannot preclude claims that accrue after it was entered.**

In the District of New Mexico, the banks have taken the position that the injunction entered below not only bars claims that accrued before June 30, 2014, but that it requires dismissal of *any* claim that *relates* in *any* way to *any* conduct that happened before June 30, 2014, regardless of when the claim accrued. JA-918, 920.

Take, for example, the claims arising from a 2017 auction that occurred after Toys "R" Us defaulted on its debt. JA-751. The New Mexico funds allege that the banks rigged that auction, skewing the bonds' apparent value down to increase the amount that credit default swaps on those bonds would pay out. JA-753-56. This auction occurred long after the New York lawsuit settled, but in the banks' view, it still must be dismissed. JA-919-20. According to the banks, because they "develop[ed], adopt[ed], and implement[ed] the CDS auction protocol prior to June 30, 2014," the New York settlement precludes any claims that they later rigged that protocol—even if they did so years after the settlement. *Id.* On that view, by settling allegations that they conspired to block the emergence of a competitor in CDS trading, the banks bought themselves the right to rig CDS-payout auctions—or anything else related to credit default swaps—for years to come. That can't be right, and it's not.

As explained above, *none* of the New Mexico claims are precluded because the banks' conspiracy to manipulate CDS settlement auctions is a different factual

predicate than CDS dealers' conspiracy to boycott a CDS exchange. But the lack of an identical factual predicate is even more stark for post-settlement auction claims: Not only do they rely on additional facts unrelated to those alleged in the New York lawsuit, they rely on facts that did not exist when the New York lawsuit settled. *See In re Am. Express Fin. Advisors*, 672 F.3d at 138 (claims involving conduct occurring after the class period could not be precluded); *cf. Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) (holding that an antitrust judgment could not preclude post-judgment claims challenging the same anticompetitive behavior); *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 383 (2d Cir. 2003) (Sotomayor, J.) ("If the second litigation involved different transactions, and especially subsequent transactions, there generally is no claim preclusion.").

The adequacy of representation problem, too, is even starker with respect to claims that could not have existed when the New York settlement was entered. The New York class representatives couldn't possibly have had claims based on auctions that had not yet occurred. They therefore could not possibly adequately represent class members in releasing those claims. *See* Section III *supra*.

Using the New York settlement to preclude claims arising from auctions that hadn't happened yet also suffers from a heightened notice problem: When they received the settlement notice, class members could not have known "the extent of [any] harm they may incur" from the banks' auction-rigging in the future. *Amchem*,

521 U.S. at 628. Accordingly, they lacked "the information or foresight needed to decide, intelligently, whether to stay in or opt out." *Id.*; *see also Stephenson*, 273 F.3d at 261 n.8 (class members who suffered future harm "likely received inadequate notice" because they would not have known about those future injuries at the time they received notice).

Finally, the banks' position—that even claims that accrued after the settlement cannot rely on any pre-June 2014 facts—would impermissibly insulate them from private antitrust liability for any CDS-related conduct well into the future. It may be decades before a litigant can bring a suit challenging the banks' involvement in credit default swaps without referencing anything that happened prior to June 30, 2014. After all, most antitrust violations depend on market power, and the banks' market power developed before 2014. If the banks are right, companies could forever immunize themselves from future antitrust liability simply by settling a single class action. *See Lawlor*, 349 U.S. at 329 (explaining that allowing companies to prevent future litigants from referencing past conduct "would in effect confer on them a partial immunity from civil liability for future violations"); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 709-10 & n.15 (1962) (evidence of market conditions and behavior pre-dating the alleged violations was "clearly material" to antitrust claims).

Fortunately, that is not the rule. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 503 (2d Cir. 2014) (no preclusion where accepting defendant's theory would "in effect immunize the defendant against all suits concerning" similar, future misconduct). To the contrary, "prospective waiver[s] of a party's right to pursue statutory remedies for antitrust violations" are "condemn[ed] … as against public policy." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *accord Lawlor*, 349 U.S. at 329; *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 241 (2013) (Kagan, J., dissenting) (noting the "uncontroversial proposition" that "courts will not enforce a prospective waiver of the right to gain redress for an antitrust injury"); *Harkins Amusement Enters., Inc. v. Harry Nace Co.*, 890 F.2d 181, 183 (9th Cir. 1989) ("It is elementary that new antitrust violations may be alleged after the date covered by … settlement of antitrust claims covering an earlier period."). That's because, particularly in the class action context, such waivers may themselves operate as an unlawful agreement in "restraint of trade" by insulating anticompetitive conduct from antitrust enforcement. 15 U.S.C. § 1. Companies may not, therefore, use past settlements to immunize future antitrust violations. *Lawlor*, 349 U.S. at 329.[7]

---

[7] In *VKK Corp. v. NFL*, 244 F.3d 114, 126 (2d Cir. 2001), this Court held that a waiver of future antitrust claims in a private settlement between two individuals was not itself an antitrust violation. That was so because this Court observed that the release would not "prevent *another*" injured party from suing to challenge the relevant

None of the New Mexico funds' claims are precluded. But if this Court disagrees, it should at least make clear that such preclusion is limited to claims that accrued before the New York settlement was entered—and that the injunction cannot bar reliance on pre-2014 conduct to prove non-precluded claims.[8]

## CONCLUSION

This Court should reverse the decision below and vacate the district court's injunction.

Respectfully submitted,

*/s/ Jennifer Bennett*
JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

---

conduct. *Id.* (emphasis added). That logic does not apply in the context of class action settlements, where a company could potentially insulate itself from suit by any private party who would have an antitrust claim.

[8] A further limitation on the injunction is obvious: Because the New York settlement release applies only to class members, it cannot affect the rights of anyone outside that class. Thus, the banks' position that the class action settlement bought them "peace" from litigation or discovery concerning pre-June 30, 2014 actions is simply incorrect, even on the banks' interpretation of that settlement. JA-925. An investor who was not a member of the New York class is free to sue the banks for any activity they want. *See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 717 (2d Cir. 2023) ("non-class members cannot be bound by any orders or judgments entered in respect to the settlement").

54

ERIC CITRON
STEFANIE OSTROWSKI**
THOMAS SCOTT-RAILTON**
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

RAÙL TORREZ
Attorney General of New Mexico
BY: SETH MCMILLAN*
Deputy Solicitor General
JULIE ANN MEADE*
Deputy Attorney General
408 Galisteo St.
Santa Fe, NM 87504
(505) 490-4058

DAVID E. KOVEL
ANDREW MARTIN MCNEELA
THOMAS POPEJOY
KIRBY MCINERNEY LLP
250 Park Avenue
Suite 820
New York, NY 10177
(212) 371-6600

CANDICE J. ENDERS
MICHAEL DELL'ANGELO
MICHAEL J. KANE
BERGER MONTAGUE PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
(215) 875-4606

RICHARD JAMES LEVERIDGE
ETHAN H. KAMINSKY
GILBERT LLP

55

700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
(202) 772-3993

ADAM FARRA
FARRA & WANG PLLC
1300 I Street, NW
Suite 400E
Washington, DC 20005
(202) 505-5990

*Pro hac vice admission pending*

**Practicing under direct supervision of member of the D.C. Bar pursuant to Rule 49(c)(8)*

April 22, 2024                    *Counsel for Interested Parties-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 32.1(a)(4) because this brief contains 13,688 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

April 22, 2024

*/s/ Jennifer Bennett*
Jennifer Bennett

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jennifer Bennett*
Jennifer Bennett